# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2577 | **DATE** | 11/17/2003 |
| **CASE TITLE** | Sandra L. Carroll vs. Jo Anne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The Commissioner's motion for summary judgment [15-1] is granted and the Claimant's motion for summary judgment [10-1] is denied. The decision of the Administrative Law Judge is affirmed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | NOV 1 8 2003 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | 11/14/2003 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| DK | courtroom deputy's initials | Date/time received in central Clerk's Office | DK mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

NOV 1 8 2003

SANDRA L. CARROLL, )
)
    Plaintiff, )
)     Case No. 03 C 2577
    v. )
)     Magistrate Judge Morton Denlow
JO ANNE B. BARNHART, )
Commissioner of Social Security, )
)
    Defendant. )

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Plaintiff, Sandra L. Carroll ("Claimant"), seeks judicial review of the decision of the Commissioner of Social Security ("Commissioner"), which found her not disabled and denied her Social Security Disability Insurance Benefits under 42 U.S.C. §§ 416(i), 423. This case is before the Court on cross-motions for summary judgment. Claimant contends she has an impairment or a combination of impairments that significantly limit her ability to perform basic work activities. Claimant further contends the Commissioner's decision should be reversed because the Administrative Law Judge ("ALJ") failed to consider the letter of a treating pulmonologist, failed to order a consultative knee examination, found Claimant's subjective complaints to be not wholly credible, and failed to consider the Vocational Expert's testimony in its entirety. For the following reasons, Claimant's motion for summary judgment is denied, the Commissioner's motion for summary judgment is granted, and the decision of the ALJ is affirmed.



## II. BACKGROUND FACTS

### A.    PROCEDURAL HISTORY

Claimant filed an application for Disability Insurance Benefits on April 2, 2001, alleging a disability effective as of July 14, 2000, due to asthma, bronchitis, and bowel and bladder incontinence. R. 65, 79. The Commissioner denied the application on June 28, 2001. R. 27. Claimant appointed an attorney as her representative and requested reconsideration on July 30, 2001. R. 31, 34. The Commissioner denied the reconsideration request. R. 36.

Claimant then filed a request for an ALJ hearing. R. 41. On July 30, 2002, a hearing was held before ALJ John Kraybill. R. 275-335. In addition to Claimant, Dr. James McKenna testified as the medical expert ("ME"), and Cheryl Hoiseth testified as the vocational expert ("VE"). R. 310-33. The ALJ kept the record open, and additional documentation was added on September 26, 2002. R. 125. The ALJ issued a decision on October 30, 2002, finding Claimant not disabled and denying disability benefits. R. 13-22. Claimant requested an Appeals Council review of the ALJ's decision on December 9, 2002. R. 7-12. The Appeals Council denied the request, R. 5-6, and the ALJ's decision stands as the final decision of the Commissioner, 42 U.S.C. § 1383(c)(3); 20 C.F.R. § 404.955.

Claimant filed a complaint in this Court on April 16, 2003, seeking a review of the Commissioner's final decision. The case comes before the Court on cross-motions for summary judgment.

### B.    HEARING TESTIMONY

#### 1.    Claimant's Hearing Testimony

Claimant was born on August 27, 1948, and was fifty-three years old at the time of the ALJ hearing. R. 128. Claimant and her husband have owned a house in Oak Lawn,

Illinois, for twenty-eight years. R. 279-80, 286. In addition, Claimant and her husband also owned a restaurant in Wisconsin. R. 280. Claimant lived in Wisconsin and ran the restaurant with weekend help from her husband for seven years. R. 286. Claimant's job duties included cooking, cleaning, and paperwork. R. 293. On July 14, 2000, the day of Claimant's alleged disability, Claimant and her husband sold the restaurant.

In 1998, Claimant had a stroke that hospitalized her for approximately three weeks. R. 280-81, 294. As a result, Claimant could no longer work in the kitchen; caught pneumonia two or three times a year; and suffered from headaches, fatigue, asthma, bronchitis, and blurred vision in her left eye. R. 280, 282. Claimant did not require either speech therapy or physical therapy. R. 282. R. 280, 293. She thought she had another stroke in April 2001. R. 294.

Claimant testified that her health began deteriorating in November 2001. R. 313. Claimant's most significant health concerns have been her breathing, bowel, and bladder problems. *Id.* At the ALJ hearing, she claimed to have quit smoking around January 2002, but immediately took back the statement and clarified that she smoked under stressful situations. R. 284-85. As of July 2002, Claimant had not quit smoking. R. 314. Claimant's voice is very raspy, like that of a smoker, and her doctors have told her that she will not stop coughing until she quits smoking. R. 314-15.

In addition, Claimant has suffered from bowel incontinence since 1997. R. 294. The bowel problems occur randomly throughout a twenty-four hour period, including nights. R. 304. In September 1998, she had bowel and bladder surgery, which temporarily solved the problem. R. 294-95. The incontinence ultimately returned, and Claimant unsuccessfully tried to use a pelvic stimulator for a year and a half to control the problem. R. 285. In order to combat the incontinence, Claimant carries clothes with her, wears Kotex, and sometimes

3

wears a diaper when she expects to be away from home for an extended period of time. R. 295-96. In addition to her regular bathroom trips, she changes the Kotex twice a day on average, unless she suffers from diarrhea, which requires three or four changes a day. R. 296. Each Kotex change takes about fifteen to twenty minutes. *Id.* She was able to work at her restaurant while experiencing the bowel problem by wearing Depends. R. 304.

In November 2001, Claimant began suffering from knee problems. R. 302. Claimant has bone spurs and degeneration in both knees, although her right knee is worse than her left. R. 287, 293. Claimant feels pain everyday when walking and sitting. R. 293. When she sits, she jiggles her legs because they feel like they fall asleep. *Id.* To treat her condition, she has had cortisone and Synvisc shots and is currently on Vioxx. R. 287. She has no side effects from her medication. R. 293.

Claimant uses a nebulizer four or five times a day, depending on her activities, and eight or nine times a day if the weather is really cold or really hot and humid. R. 288. A nebulizer treatment takes fifteen minutes to administer. R. 299. At the time of the hearing, Claimant had not necessitated a double treatment in about two weeks, but she maintains that she averages two double treatments per week. *Id.* Claimant has been taking asthma medication for at least eight to ten years, R. 307, and is currently using inhalers to combat the problem, R. 288. Claimant also has been diagnosed with emphysema. R. 291.

Claimant picks up around the house, dusts, vacuums, and does the laundry. R. 290. Claimant's house has two flights of stairs. *Id.* When Claimant does the laundry, she brings it up to the first floor, rests to avoid loss of breath, and then continues up to the bedrooms. *Id.* Claimant and her husband share cooking duties, and Claimant usually shops for groceries once a week with her son. R. 290-91, 300. Claimant spends approximately thirty minutes cooking and anywhere between one and two hours grocery shopping. R. 305. Claimant uses

4

her nebulizer when she returns from shopping. R. 306. In addition, Claimant occasionally helps dress and bathe her ninety-four year-old mother who resides in Indiana. R. 289.

Claimant testified that she can sit for an hour, stand for half-an-hour, walk half a block, and carry no more than twenty pounds. R. 292. The heaviest item Claimant carries is a fifteen to twenty-five pound bag of dog food, which she carries when she returns from her weekly trips to the grocery store. R. 300. Claimant carried items weighing twenty to twenty-five pounds once a week while working at the restaurant. R. 301.

## 2. Dr. James McKenna - Medical Expert

Dr. James McKenna, a pulmonary practitioner, testified as the ME at the ALJ hearing. R. 310-22. Dr. McKenna did not personally examine Claimant but reviewed the medical evidence and found that there was sufficient objective medical evidence in the record to allow an opinion. R. 311, 316.

Dr. McKenna opined that Claimant has smoker's bronchitis that has not quite subsided. R. 317. Additionally, Claimant has asthma, but the dosage of controllers is very mild at one puff twice a day. *Id.* A June 2001 pulmonary function test ("PFT") showed Claimant's FEV1 as 1.43 liters, 59% of predicted before bronchodilators, and 1.51 liters, 62% of predicted after bronchodilators.[1] *Id.* Claimant exceeds the FEV1 listing level of 1.15 liters for individuals who are sixty-two inches in height. *Id.* In addition, Dr. McKenna opined that there was an artifactual reduction in Claimant's diffusion capacity. *Id.* The

---

[1]Pulmonary function tests are administered to measure expiratory flow volumes and flow rates. The test requires the patient to inhale and exhale at a maximum level into a mouthpiece. In order to obtain accurate results, it is necessary for the patient to give full effort during the test. One test is administered, the patient is given an inhaled bronchodilator, then a subsequent test is administered. The purpose is to assess whether there is a response to the bronchodilator. FEV1 is the volume of air that is forcefully exhaled in one second. FVC is the volume of air that can be maximally forcefully exhaled. These values are typically reported in absolute values and as predicted percentages of normal. Percentages of normal vary based on gender, race, age, and height. This information was obtained from Virtual Hospital, *at* http://www.vh.org/adult/provider/internalmedicine/Spirometry/SpirometryModule.html (last visited Nov. 4, 2003).

reduction is attributable to her failure to take a deep enough breath when taking the test. *Id.* The velar volume, which is the basis of the diffusion capacity, was measured against a breath-hold volume of 3.11 liters but should have been measured against the total lung capacity of 4.23 liters. *Id.* Accordingly, Claimant's actual diffusion capacity was 105% of predicted. *Id.* In conclusion, Dr. McKenna testified that Claimant has a mild obstructive pattern with normal gas exchange. R. 318. Dr. McKenna, who spent "several years teaching students at Northwestern how to read pulmonary function tests," testified that the tests in the record were interpreted incorrectly. R. 321.

As for Claimant's knees, Dr. McKenna testified that Claimant had mild degenerative arthritis. R. 318. Dr. McKenna opined that Claimant's knee pain could not be from arthritis because the 2002 X-rays showed only mild degeneration, and the X-rays were too recent to allow such a conclusion. *Id.* Additionally, Dr. McKenna saw no medical evidence of knee swelling or a cartilage tear. *Id.*

Dr. McKenna did not comment on Claimant's pelvic floor muscles but rather deferred to the consultative physician. R. 318. Although the consultative physician did not have much experience with Claimant, the physician noted that the impairment was unimpressive. *Id.* At the time of the consultative exam, Claimant complained of occasional bladder and bowel incontinence. R. 322. Additionally, based on the consultative examination, Dr. McKenna found no residual effects from Claimant's stroke. R. 318.

Based on the record, Dr. McKenna opined that no impairment or combination thereof met the listings. R. 319. However, Dr. McKenna felt that some functional limitations were warranted. *Id.* For example, due to the asthmatic condition, Claimant should not be exposed to extreme cold, dusts, fumes, vapors, or spices, and thus should not cook. R. 319-20. In addition, because of her eyesight, she should not drive a commercial vehicle or after dark.

R. 319. Also, it would be ideal if Claimant had access to a bathroom in the same building as her work activity. R. 320. To the contrary, the alleged knee and spine ailments did not justify a limitation. *Id.*

### 3.     Cheryl Hoiseth - Vocational Expert.

Ms. Cheryl Hoiseth testified as the VE at the ALJ hearing. R. 323-33. Ms. Hoiseth classified Claimant's past work as a restaurant owner as medium, skilled work. R. 324. The ALJ posed to the VE the following hypothetical set of conditions: a fifty-three year-old woman with a high school education and work experience; medications with no adverse side effects; mild obstructive pulmonary disorder; mild degeneration in the right knee; prior treatment for pelvic dysfunction limiting the woman to a medium exertional level; no moderate exposure to extreme cold or respiratory irritants; inability to drive commercial vehicles or at night; and access to a bathroom. *Id.* Ms. Hoiseth stated these conditions would not allow one to perform Claimant's past relevant work. *Id.* However, at a medium exertional level, some examples of available jobs included approximately 4,400 sales clerk positions, 4,400 cashier positions, and 1,900 inventory clerk positions. R. 325.

During cross-examination, Claimant's counsel added to the ALJ's hypothetical by asking Ms. Hoiseth to assess Claimant's residual functional capacity ("RFC") if she could sit for only an hour, stand for only half-an-hour, and walk only one block. R. 325. In response, Ms. Hoiseth testified that the occupational base would be reduced to sedentary work. R. 325-26. Claimant's counsel then added a lifting limitation of an ability to lift twenty pounds occasionally and ten pounds frequently. R. 326. Ms. Hoiseth responded that this ability would add to the occupational base of sedentary work, enabling Claimant to perform between sedentary and light work. *Id.* Ms. Hoiseth testified there were approximately 110,000 jobs at the sedentary level. *Id.*

7

Claimant's counsel then went back to the ALJ's initial hypothetical and added the need to nebulize during working hours (excluding breaks) thirty minutes a day for six months of hot or cold weather and fifteen minutes a day for six months of temperate weather. R. 328. Ms. Hoiseth testified that this would erode the occupational base a little, but not much. *Id.*

Claimant's counsel again went back to the ALJ's initial hypothetical and added unproductive work time for nebulizer treatments and cleanup of incontinence episodes. R. 328-30. Along with the aforementioned nebulizer treatment time, Claimant's counsel added fifteen to twenty minutes a day to change a Kotex and a biweekly thirty minute change of clothes. R. 330. Ms. Hoiseth testified that there was still a possibility the occupational base would not be eroded because the hypothetical functional work hours exceeded the average. *Id.* Ms. Hoiseth continued, stating that if Claimant had one bad day a week, necessitating two Kotex changes in addition to a change of clothes, the limitation would create a very marginal situation but would not preclude employment. *Id.* However, two bad days a week would put her under the average functional work time. R. 332. Ms. Hoiseth stated that if Claimant frequently had two bad episodes in one day, requiring a second change of clothes and forcing her to leave work, this limitation would erode the occupational base. R. 333.

## C. MEDICAL EVIDENCE

### 1. Dr. Carolyn Rae and Dr. Dee Fenner - Treating Physicians

On June 19, 1997, Claimant underwent a pulmonary function survey that revealed a mildly reduced FVC and FEV1. R. 146. The interpreting physician diagnosed Claimant as having a mild obstructive pulmonary impairment. *Id.* Based on the test, Dr. Carolyn Rae (Primary Specialty: Internal Medicine) completed a respiratory report dated April 25, 2001, for the Bureau of Disability Determination Services ("Bureau"). R. 144-45. In response to

a question on Claimant's ability to complete work-related activities, Dr. Rae stated that Claimant had difficulty breathing on exertion with minimal activity and suffered from chronic cough and phlegm. R. 145.

On January 6, 1998, Dr. Dee Fenner surgically corrected Claimant's pelvic organ prolapse and mixed urinary incontinence. R. 253-54. Two days after the surgery, Claimant had a normal physical examination with good bowel sounds and was passing flatus. R. 254. On postoperative day three, Dr. Fenner discharged Claimant in good condition. *Id.*

On July 31, 2000, Claimant consulted Dr. Rae and complained of chronic right knee pain that had grown worse over the preceding few months. R. 240. Dr. Rae concluded that an X-ray showed the knee was normal, and she was hopeful that rest would alleviate the problem. *Id.*

### 2.    Dr. Theodore Saclarides and Dr. Linda Brubaker - Treating Physicians

From November 8 through December 11, 2000, Dr. Theodore Saclarides, a colon and rectal surgeon, wrote Dr. Rae three letters regarding Claimant's incontinence. R. 140-42. Dr. Saclarides had seen Claimant "on and off" over the last several years. R. 141. In his correspondence dated December 11, 2000, Dr. Saclarides stated that Claimant complained of daily leakage of over a tablespoon of stool without knowledge of the discharge. R. 140. Dr. Saclarides noted that Claimant was last seen in consultation by Dr. Linda Brubaker (Professor and Director, Female Pelvic Medicine and Reconstructive Surgery) on March 20, 2000. R. 141. At that time, pudendal nerve studies showed no evidence of neuropathy. R. 140. Dr. Brubaker had recommended the Claimant undergo electrical stimulation to improve her pelvic floor muscle function. R. 141. Claimant's insurance denied the $400 payment for a stimulator, but Claimant ultimately obtained one in June 2001. R. 141, 152. On December

11, 2000, Dr. Saclarides recommended electrical stimulation treatment as opposed to surgical reconstruction. R. 140.

With regard to Claimant's incontinence, Dr. Brubaker wrote a May 4, 2001, letter to the Bureau in which she noted that she saw Claimant for a "very common variety of pelvic floor disorder." R. 151. Dr. Brubaker opined that there was nothing in the record that would render Claimant ineligible for work. *Id.*

### 3. Dr. M.S. Patil - Consultative Examiner

Dr. M.S. Patil (Primary Specialty: Family Practice) performed an internal medicine consultative examination on June 8, 2001. R. 152. According to Dr. Patil, Claimant's breath sounds were mildly diminished in each lung, and a spirometry report showed mild lung findings. R. 152, 155. The PFT showed a postbronchodilator FEV1 of 60% and FVC of 65%. R. 154. Claimant's lowest FEV1 reading was 1.21. R. 155.

### 4. Dr. Robert England - Reviewing State Agency Physician

Based on a review of the medical reports, and with no examination of Claimant, Dr. Robert England completed a physical RFC assessment dated June 18, 2001. R. 160-67. Claimant's diagnosis consisted of chronic bronchial asthma with a secondary diagnosis of bowel and bladder problems. R. 160. Dr. England reported that Claimant could lift or carry fifty pounds occasionally and twenty-five pounds frequently. R. 161. In Dr. England's opinion, Claimant could stand, walk, or sit for about six hours in an eight hour workday. *Id.* The RFC assessment did not reveal any visual limitations, but did show environmental limitations of concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. R. 163-64. Despite Claimant's asthma and diminished breath sounds, Dr. England concluded that Claimant's condition did not meet or equal any pulmonary listing. R. 167. Other than hypertension, no other significant problems were found. *Id.* As a result, Dr. England stated

that Claimant's impairments reduced her physical RFC to the medium exertional level with environmental limitations. *Id.*

### 5. Dr. Samuel Farbstein - Treating Physician

After the physical RFC assessment, Claimant saw Dr. Samuel Farbstein for chest congestion, cough, knee pain, and a preoperative exam for cataract surgery. R. 223-26. On three separate occasions between October 15, 2001, and January 12, 2002, Claimant reported to Dr. Farbstein that she did not suffer from shortness of breath. R. 223, 225-26. On November 15, 2001, Claimant denied shortness of breath with regular exertion and stated she could climb two flights of stairs without difficulty. R. 225. However, on January 12, 2002, Claimant stated she was easily fatigued upon exerting herself. R. 223. Dr. Farbstein's impression was "airways obstruction of chronic bronchitis." *Id.*

### 6. Treatments for Knee

On April 16, 2001, Claimant had a bone scan. R. 189. The results showed a subtle increased radiotracer activity and degenerative changes within the right knee joint. *Id.*

Claimant underwent a right knee radiograph on February 18, 2002. R. 188. The impression from the radiograph was mild degenerative changes to the medial and patellofemoral compartment. *Id.*

Claimant visited Dr. Jay Brooker (Orthopedic Associate) for her knee pain from February 27 through July 10, 2002. R. 199-200. Claimant's history noted that she experienced knee pain "on and off" for several years. R. 200. A February 27 X-ray showed mild to moderate degenerative changes in the knee. *Id.* On March 20, Dr. Brooker ordered Synvisc injections and administered two of them on April 10. *Id.* On April 17, Claimant received two more injections and began taking Vioxx. R. 199. Claimant was doing significantly better on April 24 when she received her third set of injections. *Id.* Although

11

Claimant had some setbacks, by July 10, Dr. Brooker opined that Claimant was doing pretty well and should continue the Vioxx treatment indefinitely. *Id.*

### 7. Dr. Evan McLeod - Treating Physician

On July 1, 2002, Claimant underwent a PFT interpreted by Dr. Evan McLeod (Director, Pulmonary Function Laboratory). R. 187. According to the pulmonary function report, Claimant had not quit smoking. *Id.* Dr. McLeod interpreted the test to reveal a mild obstructive abnormality. *Id.* On September 19, 2002, Dr. McLeod wrote a letter to Claimant's attorney, stating that the findings of the July 1 test were correct and were not the result of error or suboptimal patient cooperation. R. 274.

## D. ALJ's DECISION

The ALJ's decision denying Claimant's disability insurance benefits proceeded to follow the five-step evaluation process as provided in 20 C.F.R. § 404.1520. R. 16-22. The ALJ found Claimant satisfied the first step. R. 17. Upon review of the medical evidence, the ALJ then determined that Claimant's impairments met the Regulation's definition of "severe" but were not severe enough to equal a listed impairment. *Id.*

Pursuant to the next step, the ALJ analyzed whether Claimant retained the RFC to perform her past relevant work or other work existing in significant numbers in the economy. After reviewing the medical evidence and the ME's testimony, the ALJ found Claimant did not suffer from an impairment that would preclude all types of work. R. 18. The ALJ found that Claimant's complaints lacked credibility because Claimant had no good reasons for not following her prescribed treatments. *Id.* For example, the ALJ cited Claimant's failure to quit smoking after being urged repeatedly to do so. *Id.* In addition, the ALJ noted that Claimant's smoking contributes to her other alleged ailments, such as the coughing, which invokes some of her incontinence and breathing problems. R. 19. Additionally, the ALJ

considered Claimant's daily activities of cooking, household chores, and shopping. *Id.* Further assessing Claimant's credibility, the ALJ gave weight to the State Disability Determination Service's finding of not disabled. *Id.* Also, the ALJ noted that no treating physician recommended any type of permanent restriction on Claimant's activities and that Dr. Brubaker found no evidence to support an allegation that Claimant was ineligible for work. *Id.*

The ALJ concluded that Claimant retained the RFC to perform medium level work. *Id.* However, the ALJ determined Claimant's ability to perform most of the requirements of medium level work was impeded by her exertional and non-exertional limitations. *Id.* The ALJ found Claimant: (1) should avoid extremely hot or cold environments and avoid moderate levels of dust, fumes, odors, gases, and open flames; (2) should avoid driving commercial vehicles and driving at night; and (3) must have ready access to bathroom facilities. *Id.* Based on the RFC, the VE testified that Claimant could not return to her past relevant work. R. 20.

After the ALJ posed a hypothetical, the VE gave examples of job types, among a more numerous list of jobs available at a medium exertion level, with at least 10,700 jobs that Claimant could perform. *Id.* In addition, after Claimant's counsel posed additional hypotheticals further limiting Claimant's abilities, the VE testified Claimant could perform over 110,000 sedentary level jobs. R. 21. Based on the VE testimony that Claimant's limitations did not sufficiently erode the occupational base, the ALJ found Claimant was not disabled. *Id.*

## III. LEGAL STANDARDS

### A.   STANDARD OF REVIEW

Judicial review of the Commissioner's decision denying Disability Insurance Benefits is governed by 42 U.S.C. § 405(g). Section 405(g) provides that the findings of the ALJ are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). A mere scintilla of evidence is not enough. *Id.* Even if there is adequate evidence in the record to support the decision, the findings will not be upheld if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

A reviewing court may not re-evaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the Social Security Administration. *Diaz*, 55 F.3d at 305-06. Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence to support the findings. *Scivally v. Sullivan*, 966 F.2d 1070, 1075 (7th Cir. 1992). The reviewing court has the power to enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

### B.   DISABILITY STANDARD

A person is disabled if there is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a

14

disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. § 423(d)(2)(A).

The Commissioner uses a five-step sequential process in order to determine if an individual is disabled. 20 C.F.R. § 404.1520. The sequential evaluation ends if the ALJ, at any step of the process, finds the claimant is not disabled. § 404.1520(a)(4). The ALJ must inquire: 1) whether the claimant is working and whether the work is a substantial gainful activity; 2) whether the claimant's impairment is severe; 3) whether the impairments meet or equal a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1; 4) whether the claimant is able to perform her past relevant work; and 5) whether the claimant's age, education, and past relevant work experience in reference to her RFC, enables her to do other work. § 404.1520(a)(4)(i)-(v). A person's RFC is what she can do despite any physical and mental limitations. § 404.1545(a)(1). The burden of proof is on the claimant through step four of the analysis; the burden then shifts to the Commissioner at step five. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citing *Knight v. Chater*, 585 F.3d 309, 313 (7th Cir. 1995)).

## IV. ANALYSIS

Claimant argues that the ALJ's decision should be reversed for four reasons. In particular, Claimant's arguments consist of the following: 1) the ALJ failed to consider the treating pulmonologist's letter disagreeing with the ME; 2) the ALJ did not order a consultative examination as suggested by the ME; 3) the ALJ made a conclusory rejection of Claimant's credibility regarding pain and symptoms; and 4) the ALJ failed to consider the VE's entire testimony. Each of the aforementioned issues will be discussed in turn.

15

## A.   THE ALJ DID NOT IMPROPERLY EVALUATE THE EFFECTS OF CLAIMANT'S PULMONARY DISORDER.

The first issue involves the limitations imposed by reason of Claimant's pulmonary function impairment. Claimant argues that the ALJ left a logical gap from the evidence to his conclusion because he failed to discuss Dr. McLeod's letter regarding the administration of the July 2002 PFT. As a result, Claimant argues that the ALJ improperly considered the ME's interpretation over that of Dr. McLeod, a treating physician. In addition, Claimant argues that the ALJ should have discussed the results of the June 2001 consultative examination.

When an ALJ denies benefits, the ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). However, the Seventh Circuit has repeatedly held that the ALJ need not provide a written evaluation of all evidence in the record. *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989). Instead, it is more important that the significant issues have been considered and discussed. *Id.*

This Court finds that, despite the dispute over the interpretations of the July 2002 PFT, both the ME and Dr. McLeod agreed that pulmonary obstruction that ailed Claimant was mild. R. 187, 317. Moreover, even if Dr. McLeod was correct in his interpretation, the 2002 PFT results did not meet the requirements for a listed pulmonary impairment. R. 187. Accordingly, because the ME and Dr. McLeod agreed that Claimant suffered from a mild pulmonary obstruction, their disagreement over Dr. McLeod's interpretation was immaterial.

This Court also finds that the ALJ did not improperly disregard the June 2001 PFT. Claimant argues that her FEV1 of 1.21 on the June 2001 test would meet the impairment listing for a sixty-four inch individual. However, the evidence shows that Claimant's height was measured at sixty-three inches for the June 2001 PFT and sixty-two inches for the July

16

2002 PFT. R. 155, 187. Accordingly, Claimant's height for both PFTs requires an FEV1 equal to or less than 1.15 in order to meet a listing requirement. 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.02A. Claimant's lowest reading on either PFT was 1.21. R. 155. Claimant does not meet the FEV1 listing for either PFT test, and thus does not meet the standard for a listed impairment. This Court finds that the sixty-two and sixty-three inch measurements taken for the two most recent PFTs (Claimant's height per a 1996 PFT was measured at sixty-four inches[2]) provide substantial evidence to support the ALJ's decision that Claimant did not meet the listing requirement. Moreover, Dr. Patil's impression of the June 2001 PFT stated that Claimant's lung findings were mild. R. 155.

Accordingly, this Court finds that the ALJ considered this important issue when he accounted for Claimant's mild pulmonary obstruction in her RFC assessment. R. 19. The ALJ wrote: "[C]laimant has smoking-induced *mild* obstructive pulmonary disease, with wheezing and shortness of breath for which she has been prescribed inhalers and a nebulizer." R. 18 (emphasis added). The VE accounted for this limitation and testified that Claimant's limitations, and the need to use a nebulizer would have little effect on Claimant's occupational base. R. 328.

As a result, this Court finds that the ALJ adequately addressed Claimant's mild pulmonary obstruction, and thus sufficiently considered the relevant evidence. Accordingly, the ALJ's failure to discuss Dr. McLeod's letter does not constitute a failure to build a logical gap between his conclusion and the evidence because the letter was consistent with Claimant's other PFT findings of a *mild* obstruction.

---

[2]Claimant listed her height in her Disability Report at sixty-one inches. R. 78.

## B. THE ALJ REASONABLY FOUND THAT CLAIMANT'S KNEE IMPAIRMENT DID NOT PREVENT HER FROM PERFORMING MEDIUM WORK AND NO ADDITIONAL CONSULTATIVE EXAM WAS REQUIRED.

Claimant argues that the ALJ should have ordered a consultative examination because the ME testified that another knee exam would supplement the evidence and clarify Claimant's knee condition. As a result, Claimant argues that the ALJ substituted his own judgment for that of a medical witness.

Claimant's February 2002 X-ray showed mild medial and patellofemoral compartment degenerative changes. R. 188. Based on the X-ray, the ME opined that the mild degeneration was unimpressive because most people her age would have similar results. R. 319-20. The ME testified that a cartilage tear may be causing the knee pain, but *there was no medical evidence* to support a swelling of her knees. R. 318-19. The ME concluded by stating that another exam could supplement the evidence and clarify the issue. R. 322.

An ALJ has a duty to fully and fairly develop the record. *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997). However, the Seventh Circuit generally defers to the ALJ's judgment on the quantity of evidence needed to develop the record. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). In addition, an ALJ is not required to order a consultative examination when there is no objective evidence in the record to support such an examination. *Howell v. Sullivan*, 950 F.2d 343, 349 (7th Cir. 1991). Although there is "a heavy burden on the ALJ to thoroughly investigate all evidence relating to pain," the ALJ is not required to update medical evidence through the time of the hearing. *Luna*, 22 F.3d at 692-93 (finding that medical records dated eight months prior to the hearing did not need to be updated to support claims of pain and movement restrictions); *cf. Smith v. Apfel*, 231 F.3d 433, 437-38 (7th Cir. 2000) (finding the ALJ should have ordered additional X-rays when the plaintiff's most current X-rays were taken ten years prior to the ALJ hearing).

Because there was no medical evidence to support a swelling of her knees, this Court defers to the ALJ's conclusion that an additional consultative examination was not necessary. The ALJ's opinion explicitly addressed the mild degenerative changes in Claimant's knees, and a June 2002 treatment note that indicated Claimant was doing better. R. 18. Moreover, another treatment note dated July 10, 2002, twenty days before the ALJ hearing, noted that Claimant was doing "pretty well" and should continue her current treatments indefinitely. R. 199. As a result, there was substantial medical evidence in the record to support the ALJ's finding that Claimant's knee did not warrant an additional consultative examination or an RFC limitation. Furthermore, the X-rays were five months old at the time of the ALJ hearing, three months more recent than the eight-month-old medical evidence that was sufficient in *Luna*.

Contrary to Claimant's argument, the ALJ in this matter had a substantial amount of evidence pertaining to Claimant's knee on which he could rely. The ALJ considered the ME's testimony, R. 318-22, a treating physician's July 2000 opinion that Claimant's knee X-ray was normal, R. 240, an April 2001 bone scan, R. 189, the February 2002 X-rays (which this Court has already established as sufficient), R. 188, and seven treatment notes dating from February 27, 2002, through July 10, 2002, R. 199-200. Accordingly, there is substantial evidence in the record to support the ME's testimony and the ALJ's finding.

## C. THE ALJ'S CREDIBILITY DETERMINATION WAS PROPERLY EXPLAINED.

Claimant argues that the ALJ made a conclusory rejection that Claimant's testimony regarding her pain was not fully credible because the ALJ never discussed Claimant's credibility in detail. Specifically, Claimant argues that the ALJ insufficiently analyzed Claimant's daily living activities and that the ALJ did not provide specific reasons, supported by the evidence, for his credibility determination.

19

An ALJ's credibility determinations will not be overturned unless they are patently wrong. *Jens v. Barnhart*, No. 03-1377, 2003 WL 22319564, at *5 (7th Cir. Oct. 10, 2003). An ALJ's credibility determination deserves special deference because the ALJ is in the best position to observe the witness. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Pursuant to Social Security Ruling 96-7p, the ALJ must set forth specific reasons, supported by evidence, to clarify the weight given to testimony and the reasons for that weight. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

This Court finds that the ALJ's opinion sufficiently discussed Claimant's credibility. The ALJ set forth five reasons for discounting Claimant's credibility: 1) Claimant's failure to quit smoking despite her physicians urging her to do so, and despite the effects smoking has on her coughing, breathing, and incontinence problems; 2) Claimant's performance of daily activities; 3) the State Disability Determination Services's physician's findings of "not disabled"; 4) the failure of any treating physician to recommend permanent restrictions; and 5) Dr. Brubaker's opinion that nothing in Claimant's record made her ineligible for work. R. 19. The appropriateness of the ALJ's reasoning will be addressed in turn.

First, this Court finds that the ALJ erred by relying on Claimant's failure to quit smoking. The Seventh Circuit has reasoned that it is unreliable to base a credibility determination on a Claimant's failure to quit smoking. *Shramek*, 226 F.3d at 813. Although the *Shramek* court found no link between the plaintiff's pain and her smoking, this Court, like the *Shramek* court, finds the addictive nature of smoking unrelated to the effects smoking may have on an individual's health. *Id.*

However, this error does not warrant a reversal of the ALJ's decision for two reasons. First, as discussed above, the ALJ accounted for Claimant's pulmonary obstructions in calculating Claimant's RFC, regardless of her credibility. R. 19. Second, the VE testified

20

that Claimant's nebulizer treatments and incontinence problems would not preclude employment.[3] R. 330. Accordingly, the ALJ's reliance on Claimant's smoking habits had no effect on Claimant's disability determination, and thus does not justify a reversal.

Second, this Court also finds that the ALJ's opinion inadequately addressed Claimant's daily activities. An individual's participation in minimal daily activities does not necessarily undermine testimony of disabling pain. *Zurawski*, 245 F.3d at 887. In addition, an ALJ should explain inconsistencies between daily living activities, the medical evidence, and the individual's complaints of pain. *Id.* (finding the ALJ's listing of daily activities was not sufficient to undermine claims of disabling pain, without explaining the inconsistencies). In this case, the ALJ's opinion states that Claimant performs a "variety of daily activities" and specifically mentions Claimant's cooking, household chores, and family assisted grocery shopping. R. 19. As in *Zurawski*, the ALJ listed the daily activities but did not explain how they undermined Claimant's complaints.

However, this Court again finds that the ALJ's decision did not impact the ultimate decision. With the exception of one pain disabling limitation, the ALJ addressed all of Claimant's complaints when posing the hypothetical to the VE. R. 324. Claimant's counsel then accounted for this exception by adding a limitation of an ability to sit for one hour, stand for half-an-hour, and walk one block. R. 325. After accounting for the additional limitation, the VE testified that there were 110,000 jobs available at the sedentary level. R. 325-26. Accordingly, the VE's testimony and the medical evidence support a finding that Claimant's

---

[3]Claimant's arguments regarding the ALJ's failure to address the VE's testimony on Claimant's subsequent hypotheticals are discussed in Part D of this opinion.

alleged pain did not render her unable to engage in gainful employment.[4] As a result, the ALJ's credibility determination on this issue does not justify a reversal.

As for the ALJ's third, fourth, and fifth reasons for finding Claimant's complaints not wholly credible, this Court finds there is substantial evidence to support the ALJ's determinations because they relied upon objective medical evidence. The ALJ cited the State Disability Determination Services decision of "not disabled," the fact that there are no recommendations from any treating doctor to permanently restrict any type of activity, and Dr. Brubaker's examination noting that the medical records provided no evidence of an ineligibility for work. R. 19. After a thorough review of the record, this Court finds adequate support for the ALJ's findings on all of the aforementioned reasons. Accordingly, this Court finds that the ALJ's opinion on Claimant's credibility was not "patently wrong."

Even if this Court were to find that the ALJ erred in his credibility assessment, the ALJ's opinion stated that "even if fully credited, [Claimant's complaints are] not indicative of a disabling impairment that precludes all work." R. 18. As this Court has already discussed above, the ALJ and Claimant's counsel addressed Claimant's subjective complaints. R. 324-326. Moreover, the ALJ addressed the aforementioned limitations in his opinion, and stated that there were still 110,000 jobs Claimant could perform. R. 21. Accordingly, there is substantial evidence in the record to support the ALJ's determination, regardless of the ALJ's conclusions on Claimant's credibility.

---

[4]Claimant's counsel's additional hypotheticals focused on time constraints due to nebulizer treatments and incontinence, and thus are irrelevant to a disability finding based on pain limitations.

## D. THE ALJ DID NOT IMPROPERLY FAIL TO ADDRESS THE VE'S ENTIRE TESTIMONY.

Claimant argues that the ALJ failed to address the VE's testimony that was favorable to her claim of disability. In particular, Claimant argues that the ALJ erred on two accounts pertaining to Claimant's incontinence: 1) by not discussing the VE's testimony that two bad days a week would put Claimant under the average functional work time; and 2) by not discussing that two bad episodes in one day, requiring a second change of clothes and forcing Claimant to leave work, would erode the occupational base. R. 332-33.

"An ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). "An ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required." *Id.* If an ALJ rejects uncontradicted evidence, it is indeterminable whether the ALJ properly considered all of the evidence because it is unclear whether the ALJ considered the evidence irrelevant, or forgot about the evidence. *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). However, an ALJ is not required to address every piece of testimony and evidence. *Id.* If an ALJ's opinion provides assurance that the ALJ considered the evidence in question, the ALJ has done enough. *Id.*

Although the ALJ's opinion did not discuss Claimant's hypotheticals involving two bad days a week, and two bad episodes in one day, the ALJ did address Claimant's incontinence problem. R. 21. The ALJ stated that "[e]ven with the need to use a nebulizer, change clothing throughout the day, or the need to cover a work site chair with plastic, the occupational base would not be sufficiently eroded to preclude all work activity, according to the vocational expert." *Id.* As a result, the ALJ did not fail to consider an entire line of evidence, and thus there is no indication that the ALJ forgot about the evidence.

Moreover, there is substantial medical evidence to support the ALJ's decision to disregard Claimant's counsel's additional hypotheticals. Claimant testified that she had bad experiences seven or eight times a week. R. 296. However, Claimant's testimony was contradicted by medical evidence in the record. Three physicians treated Claimant for her incontinence. After Claimant's surgical procedure in 1998, Dr. Fenner discharged her in *good* condition. R. 253-54. Although not necessarily contradictory, Dr. Saclarides, in a letter dated December 11, 2000, stated that Claimant complained of daily leakage of over a tablespoon a day. R. 140. However, Dr. Brubaker's letter of May 4, 2001, (Dr. Brubaker was the last treating physician to see Claimant regarding her incontinence on March 20, 2000, R. 141) stated that she treated Claimant for a *very common* pelvic floor disorder and there was nothing in Claimant's record that would render her ineligible for work. R. 151. In addition, Dr. Patil saw Claimant in consultation on June 8, 2001, and noted that Claimant complained of *occasional* incontinence of the bladder and bowel. R. 152. Furthermore, this Court finds it troubling that Claimant testifies to incontinence requiring a change of clothes seven or eight times a week, but has not consulted a treating physician within the last two years. Claimant last saw Dr. Brubaker in March 2000, over two years and four months before the ALJ hearing. R. 151. Although it is possible Claimant's condition may have grown worse between June 2001 and the ALJ hearing on July 2002, there is no medical evidence to support such a finding.

Accordingly, this Court finds that there was substantial evidence in the record to support the ALJ's decision to disregard Claimant's last two hypotheticals. In addition, the ALJ's opinion addresses the issue of incontinence and therefore provides this Court with assurance that he considered the evidence in question.

## V. CONCLUSION

For the reasons stated above, **the Commissioner's motion for summary judgment is granted and the Claimant's motion for summary judgment is denied. The decision of the ALJ is affirmed.**

**SO ORDERED THIS 17th DAY OF NOVEMBER, 2003.**

**MORTON DENLOW**
**United States Magistrate Judge**

**Copies mailed to:**

John E. Horn
16710 Oak Park Avenue
Tinley Park, IL 60477

Counsel for Plaintiff

Kathryn A. Beverly
Special Assistant United States Attorney
200 West Adams Street, 30th Floor
Chicago, IL 60606

Counsel for Defendant

# United States District Court
## Northern District of Illinois
### Eastern Division

Sandra L. Carroll

**JUDGMENT IN A CIVIL CASE**

v.

Case Number: 03 C 2577

Jo Anne B. Barnhart

☐    Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■    Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that The Commissioner's motion for summary judgment is granted and the Claimant's motion for summary judgment is denied. The decision of the Administrative Law Judge is affirmed.

Michael W. Dobbins, Clerk of Court

Date: 11/17/2003

Donna Kuempel, Deputy Clerk